In the

# United States Court of Appeals

## For the Seventh Circuit

No. 17-1727

SCOTT SCHMIDT,

*Petitioner-Appellant,*

*v.*

BRIAN FOSTER,

*Respondent-Appellee.*

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 13-CV-1150 — **Charles N. Clevert, Jr.**, *Judge.*

ARGUED JANUARY 4, 2018 — DECIDED MAY 29, 2018

Before WOOD, *Chief Judge*, and HAMILTON and BARRETT, *Circuit Judges*.

HAMILTON, *Circuit Judge*. Petitioner Scott Schmidt murdered his wife, Kelly Wing-Schmidt. He admitted the murder but tried to rely on the state-law defense of "adequate provocation" to mitigate the crime from first- to second-degree homicide. A state trial judge denied Schmidt the assistance of his counsel while the judge questioned Schmidt in a pretrial

hearing on that substantive issue. Under law clearly established by the Supreme Court of the United States, the evidentiary hearing on that substantive issue was a "critical stage" of Schmidt's prosecution. By denying Schmidt the assistance of counsel in that critical stage, the state court violated his Sixth Amendment right to counsel.

The Sixth Amendment guarantees the accused in a criminal case "the Assistance of Counsel for his defence." Because "an unaided layman" has "little skill in arguing the law or in coping with an intricate procedural system," the Supreme Court has long held that the right to counsel extends beyond the trial itself. *United States v. Ash*, 413 U.S. 300, 307 (1973). Criminal prosecutions involve "critical confrontations" before trial "where the results might well settle the accused's fate." *United States v. Wade*, 388 U.S. 218, 224 (1967). The Sixth Amendment therefore guarantees defendants "the guiding hand of counsel" at all "'critical' stages of the proceedings." *Id.* at 224–25, quoting *Powell v. Alabama*, 287 U.S. 45, 69 (1932).

Since Schmidt admitted having murdered his wife, the only substantive issue in the prosecution was whether he acted under "adequate provocation," which in Wisconsin would mitigate homicide from first to second degree. The prosecution opposed Schmidt's intended defense, arguing before trial that he had failed to offer "some evidence" of provocation, which would be sufficient to shift the burden of persuasion to the state to disprove provocation beyond a reasonable doubt. The trial court chose to address this critical substantive issue before trial.

After a hearing where counsel debated the defense's written summary of evidence of provocation, the trial court held

an unprecedented *ex parte*, *in camera* hearing. The judge allowed Schmidt's counsel to attend the hearing but, critically, did not allow him to speak or participate. Instead, the judge questioned Schmidt directly. After listening to Schmidt's answers, the judge ruled that Schmidt could not present the adequate provocation defense at trial. A jury convicted Schmidt of first-degree intentional homicide, and he was sentenced to life in prison.

Schmidt sought post-conviction relief, and the Wisconsin Court of Appeals held that the trial court did not violate Schmidt's Sixth Amendment right to counsel. That decision was an unreasonable application of clearly established Supreme Court precedent guaranteeing counsel at all critical stages of criminal proceedings, including whenever "potential substantial prejudice to defendant's rights inheres in the particular confrontation." *Wade*, 388 U.S. at 227. Schmidt therefore meets the stringent standards for habeas corpus relief under 28 U.S.C. § 2254(d)(1).[1]

I. *Factual & Procedural Background*

In April 2009, Schmidt shot his wife, Kelly Wing-Schmidt, seven times. She died in their driveway. When police officers

---

[1] The usual relief in such a case would be to order the State either to release Schmidt or to retry him. A different remedy may be appropriate here. In the district court, the State requested the option to ask the state trial court to modify the judgment of conviction to second-degree intentional homicide and to resentence Schmidt accordingly. In briefing in this appeal, Schmidt says he agrees with that request. On remand, the district court should consider that option, in addition to the usual choices of retrial or release.

arrived, they found Schmidt standing by her body. He quickly admitted he had shot her.

A. *The Trial Court Proceedings*

Wisconsin charged Schmidt with first-degree intentional homicide. Schmidt never denied shooting and killing Kelly, but he intended to argue at trial that he acted with "adequate provocation." In Wisconsin, adequate provocation is an affirmative defense that mitigates intentional homicide from first to second degree for defendants who "lack self-control completely at the time of causing death." Wis. Stat. §§ 939.44; 940.01(2)(a). To be "adequate," the provocation must be "sufficient to cause complete lack of self-control in an ordinarily constituted person." § 939.44. If the defendant can produce "some" evidence supporting adequate provocation before trial, then the defendant may introduce evidence of the defense at trial. *State v. Schmidt*, 824 N.W.2d 839, 843 (Wis. App. 2012), citing *State v. Head*, 648 N.W.2d 413, 439 (Wis. 2002). The prosecution must then disprove the defense beyond a reasonable doubt. *Schmidt*, 824 N.W.2d at 843, citing *Head*, 648 N.W.2d at 437–38.

Schmidt filed a pretrial motion disclosing that he would present evidence of provocation through "false allegations, controlling behaviors, threats, isolation, unfaithfulness, verbal abuse and arguments." Schmidt planned to present evidence that his wife had abused him emotionally and physically throughout their marriage. He would have testified that right before the shooting, he and Kelly had a heated argument in which Kelly taunted him about an affair he had just discovered, told him their children were not actually his, and threatened to make up stories so that he would never see their children again. According to Schmidt, he lost self-control and

shot his wife. The State objected to the evidence, arguing that Schmidt's disclosure lacked specificity and that the circumstances did not support an adequate provocation defense. The State also argued that Schmidt did not clarify the timeframe covered by his proposed evidence and that evidence dating back too far would be irrelevant and prejudicial.

The court acknowledged the State's concerns. Over Schmidt's objection, the court scheduled a hearing to determine whether Schmidt had met the some-evidence standard and could present the defense at trial. Before the hearing, Schmidt submitted two documents: an offer of proof summarizing the testimony of twenty-nine potential witnesses and a legal analysis of the provocation defense with a timeline of events from 2004 through the 2009 shooting.

The evidentiary hearing began in court with Schmidt, his lawyer, and the prosecutor present. The judge was not prepared to decide on the paper submissions alone whether Schmidt could meet the "some evidence" threshold for the provocation defense. Schmidt's lawyer objected to having to expose his defense evidence before trial. The judge decided that he should question Schmidt *ex parte* to assess the provocation defense. Schmidt's counsel agreed that if the court intended to question Schmidt, it should do so in chambers outside of the prosecutor's presence. The court then proposed to the prosecutor that Schmidt's counsel would attend the hearing in chambers, but would "just be present" and "not saying anything." The prosecutor agreed. Schmidt's counsel did not object, but nobody asked Schmidt if he was willing to go forward in this hearing, so critical to his fate, without the assistance of his lawyer.

The trial judge, court reporter, Schmidt, and Schmidt's counsel proceeded to the judge's chambers. The judge stated that Schmidt "appears in person" and that "his attorney is also present but is not participating in the hearing." The court then asked Schmidt an open-ended question about what was on his mind when he shot Kelly. Schmidt gave the first of what would be several rambling narrative responses:

> The day I went over was April 17th. I hadn't slept in at least a week, week-and-a-half. And I—it was like two days before that, I believe the 14th of April, the 14th or 15th of April I think it was, that I found an e-mail on my work computer from a—of a reservation for my wife and a guy that she supposedly was a friend with that worked for Gold Cross Ambulance. And I found that when I was at the fire station. I knew of him, up until that point, that they were friends.

> Um, I had been out of the house for a couple of weeks. And I walked there. I went to the fire station, and I walked up to the house, because I knew there were some issues with, um, Kelly had threatened to take—these aren't my f'ing kids, that if she saw me at the house that she didn't want—I wasn't going to be part of the kids' lives anymore, our two youngest children. I just had a feeling that she'd probably call the cops if I pulled in the driveway. So I parked at the station, Fire Station 6, over on Lightning, and I walked to the house.

> Actually, my main goal was, um, I had a job to do. I was going to build a house for a retired battalion chief up in Door County. And all my tools, my job trailer, and everything was at our house on JJ on Edgewood. I was at the time staying out at the lake—the lake house that I had—had owned prior to us being married in Stockbridge. And there's—I didn't have any heat, slept on the couch, there was no blankets. I mean, it was—there were no dishes. I had—everything was—the house was empty. Gas was actually shut off because we—instead of paying the bills there, I wanted to make sure the bills were paid where the kids and Kelly were at … .

That first answer continued for fourteen transcript pages. Thus began what the Wisconsin Court of Appeals called a "rambling narrative" that spans thirty-five transcript pages. *Schmidt*, 824 N.W.2d at 847. The trial court asked Schmidt the same open-ended question about his mental state six times. Each time Schmidt's response was unfocused and confused with irrelevant details.

Near the end of the questioning, the judge took a short break for a telephone call. Schmidt's lawyer asked if he could talk to Schmidt. The judge responded that they should limit discussion to reviewing the written offer of proof. After the break, the judge asked Schmidt a few more questions before ending the hearing. Later that day, the court orally announced that "the circumstances that led to the death of Kelly Wing did not involve a provocation" and denied Schmidt's motion to present the defense at trial, rejecting it conclusively.

B.  *Post-conviction Processes*

A jury convicted Schmidt of first-degree intentional homicide.[2] Schmidt moved for a new trial, arguing that he had been denied his Sixth Amendment right to counsel and his Sixth and Fourteenth Amendment right to present a defense. The trial court denied the motion, concluding that Schmidt had not met his burden of production to present the adequate provocation defense. The trial court also concluded that Schmidt was not denied counsel at the *ex parte* hearing because his counsel submitted the written offer of proof, made an oral argument, and conferred with Schmidt during the recess for the judge's telephone call.

Schmidt appealed, and the Wisconsin Court of Appeals affirmed. The Court of Appeals found that Schmidt had not met the some-evidence standard, though the court called it "a close question." The court found that the *ex parte* interrogation was a valid exercise of the trial judge's discretion under state law. Turning to the Sixth Amendment question, the Court of Appeals found that the *ex parte* hearing was not a critical stage of the proceedings at which Schmidt was entitled to counsel. The court also reasoned that the hearing was not adversarial and that counsel was available to advise Schmidt. The court did not reach Schmidt's claim that the hearing violated his right to present a defense. The Wisconsin Supreme Court denied review.

Schmidt then sought habeas corpus relief in federal court, raising the Sixth and Fourteenth Amendment claims. The district court denied relief on both. The district court considered

---

[2] The jury also convicted Schmidt of recklessly endangering safety and bail-jumping. He does not challenge those convictions.

*de novo* Schmidt's claim that he was denied the right to present a defense and concluded that the Wisconsin evidence law did not deprive him of that right because it protected a legitimate interest and was not arbitrary or disproportionate. The court next found that the deferential standard of review under the Antiterrorism and Effective Death Penalty Act (AEDPA) governed the Sixth Amendment claim. See 28 U.S.C. § 2254(d). The district court concluded that the Wisconsin Court of Appeals decision was not contrary to or an unreasonable application of Supreme Court precedent guaranteeing criminal defendants counsel at all critical stages. The district court therefore denied habeas relief but granted a certificate of appealability on both issues.

II. *Analysis*

The Wisconsin Court of Appeals rejected Schmidt's Sixth Amendment claim on the merits, and the facts are not disputed. Under AEDPA, a federal court therefore cannot grant a writ of habeas corpus on that claim unless the state court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). A state court's decision is unreasonable if it correctly identifies the controlling Supreme Court precedent but "unreasonably extends" that "legal principle" to "a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Williams v. Taylor*, 529 U.S. 362, 407 (2000). To obtain federal relief, Schmidt must show that the state court decision was not just incorrect but "objectively unreasonable." *Id.* at 409–10; accord, e.g., *Woodford v. Visciotti*, 537 U.S. 19, 24–25 (2002)

(per curiam). This standard is meant to be "difficult to meet." *Harrington v. Richter*, 562 U.S. 86, 102 (2011).

Even under this deferential standard, Schmidt is entitled to a writ of habeas corpus. The state-court decision was an objectively unreasonable application of Supreme Court decisions on the right to counsel. The *ex parte* hearing was a critical stage of the proceeding. Schmidt was guaranteed "the guiding hand of counsel" throughout it, see *Powell*, 287 U.S. at 69, but he did not have that guidance because of the judge's ground rules for his inquisition of Schmidt, barring his counsel from participating. Because we grant Schmidt's petition based on the violation of his right to counsel, we do not reach his claim that the trial court also denied his right to present a defense.

A.  *"Critical Stage"*

The Sixth Amendment guarantees that in "all criminal prosecutions, the accused shall enjoy the right" to "have the Assistance of Counsel for his defence." The Supreme Court has long recognized that the right applies not only at trial but also at all "critical stages" of the adversary process. The first question in this case is the scope of the Supreme Court's precedents on what constitutes a "critical stage."

A brief look at the history of the Sixth Amendment provides helpful context for understanding the scope of a defendant's right to counsel in pretrial proceedings. In *United States v. Wade*, 388 U.S. 218 (1967), the Supreme Court explained:

> The Framers of the Bill of Rights envisaged a broader role for counsel than under the practice then prevailing in England of merely advising his client in 'matters of law,' and eschewing any

responsibility for 'matters of fact.' The constitutions in at least 11 of the 13 States expressly or impliedly abolished this distinction. *Powell v. State of Alabama*, 287 U.S. 45, 60–65; Note, 73 Yale L.J. 1000, 1030–1033 (1964). 'Though the colonial provisions about counsel were in accord on few things, they agreed on the necessity of abolishing the facts-law distinction; the colonists appreciated that if a defendant were forced to stand alone against the state, his case was foredoomed.' 73 Yale L.J., *supra*, at 1033–1034. This background is reflected in the scope given by our decisions to the Sixth Amendment's guarantee to an accused of the assistance of counsel for his defense. When the Bill of Rights was adopted, there were no organized police forces as we know them today. The accused confronted the prosecutor and the witnesses against him, and the evidence was marshalled, largely at the trial itself. In contrast, today's law enforcement machinery involves critical confrontations of the accused by the prosecution at pretrial proceedings where the results might well settle the accused's fate and reduce the trial itself to a mere formality. In recognition of these realities of modern criminal prosecution, our cases have construed the Sixth Amendment guarantee to apply to 'critical' stages of the proceedings. The guarantee reads: 'In all criminal prosecutions, the accused shall enjoy the right * * * to have the Assistance of Counsel *for his defence*.' (Emphasis supplied.) *The plain wording of*

> *this guarantee thus encompasses counsel's assistance whenever necessary to assure a meaningful 'defence.'*

388 U.S. at 224–25 (footnotes omitted, emphasis added).

The Court has identified two historical reasons for the right to counsel. First was the development of an "intricate procedural system." *United States v. Ash*, 413 U.S. 300, 307 (1973). As the Court explained:

> A concern of more lasting importance was the recognition and awareness that an unaided layman had little skill in arguing the law or in coping with an intricate procedural system. The function of counsel as a guide through complex legal technicalities long has been recognized by this Court. […] The Court frequently has interpreted the Sixth Amendment to assure that the 'guiding hand of counsel' is available to those in need of its assistance.

*Id.* at 307–08. Second was the development of the public prosecutor: "Another factor contributing to the colonial recognition of the accused's right to counsel was the adoption of the institution of the public prosecutor from the Continental inquisitorial system." *Id.* at 308. "Thus, an additional motivation for the American rule" that a criminal defendant is entitled to counsel "was a desire to minimize imbalance in the adversary system that otherwise resulted with the creation of a professional prosecuting official." *Id.* at 309. An uncounseled defendant could not be expected to argue his case, navigate the rules of evidence, or articulate his defenses with the same skill as an "expert adversary," the prosecutor. *Id.* at 310.

Over time, the same became true of various pretrial steps in prosecutions. With increasing frequency, defendants confronted issues before trial that previously would have surfaced at trial—issues like articulating defenses or disputing the admissibility of evidence. With the history of the Sixth Amendment in mind, the Court has repeatedly applied the right to counsel to these critical confrontations "that might appropriately be considered to be parts of the trial itself," that is, steps when "the accused was confronted, just as at trial, by the procedural system, or by his expert adversary, or by both." *Id.* at 310. The Court has called these confrontations "critical stages." See, e.g., *Wade,* 388 U.S. at 224; *Hamilton v. Alabama,* 368 U.S. 52, 53–54 (1961).

It is clearly established that criminal defendants are entitled to counsel at all critical stages of the criminal process, and the case law on which stages are critical is extensive. The State relies here on *Carey v. Musladin,* 549 U.S. 70 (2006), which explained that "clearly established Federal law" under § 2254(d)(1) includes only the Supreme Court's holdings, not its dicta. *Id.* at 74. In *Carey,* the Court rejected a Ninth Circuit decision for reading Supreme Court precedent at too high a level of generality. *Id.* at 75–76. Wisconsin uses *Carey* to argue that no clearly established federal law applies to this case because the Supreme Court has not held that a hearing like the extraordinary *ex parte, in camera* hearing here is a critical stage.

AEDPA deference does not go so far. A few months after deciding *Carey,* the Court clarified that AEDPA does not require "federal courts to wait for some nearly identical factual pattern" before granting relief. *Panetti v. Quarterman,* 551 U.S. 930, 953 (2007), quoting *Carey,* 549 U.S. at 81 (Kennedy, J., con-

curring in judgment); see also *Williams*, 529 U.S. at 407 (holding that state courts can unreasonably apply clearly established federal law to facts the Supreme Court has not considered). "Nor does AEDPA prohibit a federal court from finding an application of a principle unreasonable when it involves a set of facts 'different from those of the case in which the principle was announced.'" *Panetti*, 551 U.S. at 953, quoting *Lockyer v. Andrade*, 538 U.S. 63, 76 (2003).

What matters here is what the Supreme Court has done and what it has said in deciding its many "critical stage" cases, which we address next. Also, it is not surprising that the Supreme Court has not considered an *ex parte, in camera* hearing on a substantive issue quite like this one. "The very premise of our adversary system of criminal justice is that partisan advocacy on both sides of a case will best promote the ultimate objective that the guilty be convicted and the innocent go free." *United States v. Cronic*, 466 U.S. 648, 655 (1984), quoting *Herring v. New York*, 422 U.S. 853, 862 (1975). In this case the trial court improvised an unprecedented procedure that both abandoned that "very premise of our adversary system of criminal justice" to question the defendant directly *and* prohibited defense counsel from participating. While trial judges have discretion to question witnesses directly, this inquisitorial procedure in which defense counsel is silenced is not compatible with the American judicial system. See *Williams v. Wahner*, 731 F.3d 731, 732–33 (7th Cir. 2013) (declaring unlawful a federal judge's practice of questioning prisoner-plaintiff in *ex parte* hearing to decide material factual disputes against the plaintiff, and comparing procedure to inquisitorial procedures from European legal systems). As the *Herring* Court explained further: "the right to the assistance of counsel has been understood to mean that there can be no restrictions

upon the function of counsel in defending a criminal prosecution in accord with the traditions of the adversary factfinding process that has been constitutionalized in the Sixth and Fourteenth Amendments." 422 U.S. at 857, quoted in *Cronic*, 466 U.S. at 656 n.15.[3]

### 1. *Confrontation*

Turning first to what the Court has actually done, as the State conceded at oral argument, the Court has treated as a "critical stage" every stage of the criminal process between arraignment and appeal that addresses a substantive issue or risks loss of procedural rights. As examples, the Court has recognized the following as critical stages: a preliminary hearing at which defendant could cross-examine witnesses and otherwise test the evidence against him; arraignments at which defenses must be asserted; entry of a plea; pretrial identification

---

[3] By "inquisitorial," we "don't mean it was modeled on the procedures employed by the Inquisition." *Henderson v. Wilcoxen*, 802 F.3d 930, 931 (7th Cir. 2015). We refer to the "system of proof-taking used in civil law, whereby the judge conducts the trial, determines what questions to ask, and defines the scope and the extent of the inquiry." *Inquisitorial System*, Black's Law Dictionary (10th ed. 2014). As the Supreme Court has explained: "What makes a system adversarial rather than inquisitorial is not the presence of counsel … but rather the presence of a judge who does not (as an inquisitor does) conduct the factual and legal investigation himself, but instead decides on the basis of facts and arguments pro and con adduced by the parties." *McNeil v. Wisconsin*, 501 U.S. 171, 181 n.2 (1991). Although many countries continue to use inquisitorial systems of factfinding, our Constitution establishes an adversarial system. Cf. *Henderson*, 802 F.3d at 931 ("In modern usage an inquisitorial hearing is a hearing in open court in which the judge examines the parties to the suit rather than leaving examination to the lawyers, as in our legal system, which is adversarial rather than inquisitorial.").

through an in-person line-up; pretrial interrogation by a government informant; sentencing hearings; and deferred sentencing hearings that revoke probation. See *Coleman v. Alabama*, 399 U.S. 1, 9 (1970) (plurality); *id.* at 11 (Black, J., concurring) (preliminary hearing where defendant could test evidence to avoid indictment and build record for trial); *Hamilton*, 368 U.S. at 54 (arraignment where defenses can be "irretrievably lost, if not then and there asserted"); *White v. Maryland*, 373 U.S. 59, 60 (1963) (entry of plea); *Moore v. Michigan*, 355 U.S. 155, 156, 159 (1957) (entry of plea); *Wade*, 388 U.S. at 236–37 (pretrial in-person identification); *Massiah v. United States*, 377 U.S. 201, 206 (1964) (pretrial interrogation); *Townsend v. Burke*, 334 U.S. 736, 740–41 (1948) (sentencing); *Mempa v. Rhay*, 389 U.S. 128, 137 (1967) (deferred sentencing and revocation of probation).

The sheer number and range of these cases show that the right to counsel at "critical stages" is not narrow and fact-bound. The Court has explained its decisions by focusing on the consequences of the particular stage, and in particular on consequences for the defendant's ability to receive a fair trial. In *Wade*, the Court summarized:

> In sum, the principle of *Powell v. Alabama* and succeeding cases requires that we scrutinize any pretrial confrontation of the accused to determine whether the presence of his counsel is necessary to preserve the defendant's basic right to a fair trial as affected by his right meaningfully to cross-examine the witnesses against him and to have effective assistance of counsel at the trial itself. It calls upon us to analyze whether potential substantial prejudice to defendant's

> rights inheres in the particular confrontation and the ability of counsel to help avoid that prejudice.

*Wade*, 388 U.S. at 227. In *Mempa v. Rhay*, the Court summarized its precedents as "clearly stand[ing] for the proposition that" counsel is "required at every stage of a criminal proceeding where substantial rights of a criminal accused may be affected." 389 U.S. at 134. In *Coleman v. Alabama*, the Court quoted the above passage from *Wade* and referred to it as a "test" that the Court had consistently applied throughout its critical-stage precedents. 399 U.S. at 8. And in *Ash*, the Court stated that its "review of the history and expansion of the Sixth Amendment counsel guarantee" demonstrated "that the test utilized by the Court has called for examination of the event in order to determine whether the accused required aid in coping with legal problems or assistance in meeting his adversary." 413 U.S. at 313.

It is true that many of the Court's "critical-stage" cases address direct confrontations between the defendant and the professional prosecutor, and that the prosecutor was not in the room for the hearing at issue in this case. See, e.g., *Coleman*, 399 U.S. at 9 (preliminary hearing where defendant could test prosecutor's evidence before trial); *Mempa*, 389 U.S. at 137 (deferred sentencing hearing where prosecutor argued for revocation of probation). That is typically how proceedings are held when the rules of adversarial proceedings are followed, but the Supreme Court's clearly established precedent is not limited to adversarial confrontations where the prosecution and/or police are literally in the room with the accused. We cannot imagine that the Supreme Court would tolerate a procedure in which the trial judge, without a valid

waiver of the right to counsel, took the defendant alone into chambers for questioning on the record on any substantive issue. The result is no different here, where the lawyer was physically present but prohibited from speaking or otherwise participating.

First, in *Estelle v. Smith*, 451 U.S. 454 (1981), the Court held that a trial judge had violated the accused's right to counsel in a non-adversarial setting where the prosecutor was absent. The judge "informally ordered" a psychiatrist to examine the accused to determine competency to stand trial. *Id.* at 456–57, 457 n.1. The defendant was found competent to stand trial and then found guilty at trial. At the penalty phase of the trial, the judge then allowed the state to offer the contents of the interview and the psychiatrist's opinion to prove future dangerousness. The defense lawyer had not been notified in advance that the psychiatric examination would take place, let alone that it would include the issue of future dangerousness. *Id.* at 470–71, 471 n.15. The accused did not have his assistance in deciding whether to submit to the examination. *Id.* at 471. The Supreme Court held (unanimously) that the judge's non-adversarial decision to order the psychiatric interview—with only the accused and the psychiatrist present—was a critical stage of the proceedings and that the accused had a right to a lawyer in deciding whether to submit to it. *Id.* at 470–71.[4] Critically, the Court held that the defendant was entitled to counsel's advice *before* the interview itself, because it "follows logically" from the Court's "precedents that a defendant should not be forced to resolve such an important issue 'without the

---

[4] The Court did not hold that the accused had a right to have his lawyer present for the examination itself, but he had a right to the advice of counsel in deciding whether to submit to it. 451 U.S. at 470 n.14.

guiding hand of counsel.'" *Id.* at 471, quoting *Powell*, 287 U.S. at 69. Resolving that issue—whether to submit to the evaluation—did not involve an in-person confrontation with the prosecutor, the police, or any other agent of the state.

Similarly, in *Geders v. United States*, the Court found that the defendant's right to counsel had been violated when, during trial, the judge ordered the defendant not to consult with his attorney during an overnight recess. 425 U.S. 80, 81 (1970). The trial itself, of course, is a stage in the criminal process where the defendant has a right to counsel (and the Court therefore did not need to engage in a critical-stage analysis). But the overnight recess was not a formal part of the trial proceedings and did not occur in the courtroom or in the prosecutor's presence. Yet the defendant did not lose his right to counsel when he left the courtroom and the traditionally adversarial setting. He required his counsel's guidance overnight to make tactical decisions in light of the proceedings against him. *Id.* at 88–89, 91. Importantly, the Court did not analyze the overnight recess as a separate stage that may or may not be critical by itself. Underlying both *Smith* and *Geders* is the recognition that the accused needs and is entitled to the assistance of counsel in making choices throughout the prosecution, regardless of whether the precise moment in question is "adversarial" in the sense that the professional prosecution or police are literally in the room at the time.

More generally, the Court has repeatedly applied the "critical stage" analysis by focusing on the consequences the accused faces in the particular stage of the case, not necessarily on whether the prosecution or police are in the room. That is clear from the critical "or" in *Ash*: "This review of the history and expansion of the Sixth Amendment counsel guarantee

demonstrates that the test utilized by the Court has called for examination of the event in order to determine whether the accused required aid in coping with legal problems *or* assistance in meeting his adversary." 413 U.S. at 313 (emphasis added).

Confirming the importance of that "or" in *Ash*, the Court has recognized as critical stages several proceedings that require defendants to make procedural decisions. In those cases, it was the defendant's inability to cope with the procedural system—not any face-to-face confrontation with the prosecutor—that drove the Court's holdings. See, e.g., *Hamilton*, 368 U.S. 52 (finding Alabama arraignment a critical stage because the defendant had to assert or forfeit defenses, without any mention of prosecutor or contested issues); *White*, 373 U.S. 59 (finding Maryland preliminary hearing a critical stage because defendant had to enter a plea, without any mention of prosecutor or contested issues); *Smith*, 451 U.S. 454 (finding decision to submit to psychiatric evaluation on competence to stand trial a critical stage, without any mention of prosecutor or contested issues).

And this makes sense. When a defendant confronts a purely procedural question—even outside of the courtroom and outside of the prosecutor's presence—he does so in response to the adversary proceedings that the prosecution has brought against him. One motivation for the right to counsel "was a desire to minimize the imbalance in the adversary *system*," which recognizes that a layperson does not have the same skill or knowledge necessary to navigate the law. *Ash*, 413 U.S. at 309 (emphasis added). After all, requiring an uncounseled defendant to make a consequential procedural decision can easily undermine the desired balance between the

prosecutor and the accused, prejudice the defense, and reduce "the trial itself to a mere formality." *Wade*, 388 U.S. at 224 (explaining that goal of right to counsel at critical stages is to preserve the integrity of the trial).

By looking both at what the Supreme Court has done and at what it has said, it is clear that an evidentiary hearing on a contested substantive issue is a critical stage of the proceedings. There is no reason to think the result is different when the judge moves half of the hearing into chambers and elicits, through the judge's own questioning, the defendant's rebuttal to the prosecutor's opposition. Against the weight of the many cases finding pretrial stages were critical as long as the accused might face serious consequences affecting the fairness of the trial, the State has not identified any Supreme Court case even suggesting, let alone holding, that a hearing comparable to the one in this case was not a critical stage.

The Court has found stages not critical only when they are non-adversarial *and* there is no risk that an accused might make mistakes that a lawyer cannot cure before or at trial. In *Ash* itself, for example, the Court distinguished between an eyewitness identification by in-person lineup, which *Wade* held is a critical stage, and a witness's identification by looking at a photographic array, which is not. 413 U.S. at 317. At a line-up, the defendant is present and confronts either law enforcement or the prosecutor. Without counsel's observation and guidance, "there is a grave potential for prejudice" because the uncounseled defendant is unable to identify a suggestive procedure and unlikely to be able to reconstruct a biased procedure at trial. *Wade*, 388 U.S. at 230–32, 236. A photographic array, by comparison, is only non-adversarial gathering of evidence outside of the defendant's presence. There

is "no possibility" that "the accused might be misled by his lack of familiarity with the law or overpowered by his professional adversary." *Ash*, 413 U.S. at 317. The Court reached a similar conclusion in *Gerstein v. Pugh* when it found that the probable cause determination, by itself, is not a critical stage. 420 U.S. 103, 120, 122 (1975). Probable cause is typically decided "by a magistrate in a nonadversary proceeding on hearsay and written testimony." *Id.* at 120. It does not require the defendant's participation and its outcome cannot "impair defense on the merits." *Id.* at 122.

The Supreme Court has clearly established that the right to counsel extends to a pretrial evidentiary hearing on a contested, substantive issue, where an uncounseled defendant risks decisive consequences for his prospects at trial. E.g., *Coleman*, 399 U.S. at 9 (plurality); *id.* at 11 (Black, J., concurring); *Wade*, 388 U.S. at 227, 236–37. In this case, the Wisconsin Court of Appeals correctly recognized the general rule that the Sixth Amendment guarantees counsel at all critical stages. But the court strayed in finding that the *ex parte* hearing was not a critical stage in Schmidt's case.

The state court's observation that the *ex parte*, *in camera* proceeding was not adversarial, in the sense that the prosecutor was not in the room, thus missed the point. It unreasonably applied Supreme Court precedent and, frankly, ignored reality in favor of a formalism that the Court has not adopted. The *ex parte*, *in camera* hearing was not a distinct stage in Schmidt's case. It was part of the evidentiary hearing the court held to address a substantive issue—the mitigating defense of adequate provocation. That defense was certainly contested. That is precisely why the judge held the hearing: to determine whether the prosecution or defense had the better arguments

on the adequate provocation defense. The prosecution opposed admission of the evidence related to the defense, while Schmidt argued that he had met the threshold showing for admissibility. Schmidt presented part of his side of the case in the judge's chambers, but that fact makes no difference given what the Supreme Court has held to be critical stages. There is no question that the overall hearing was an adversary proceeding. Nothing in the Supreme Court's extensive critical-stage jurisprudence suggests that the hearing became any less critical, or any less of a "trial-like confrontation," when the judge took the accused and his (silenced) lawyer into chambers to question him about the facts supporting the defense.

In addition to confronting the prosecutor's substantive arguments on the disputed provocation defense, Schmidt needed to navigate the "complex legal technicalities" of the "intricate procedural system." *Ash*, 413 U.S. at 307. He needed to meet the burden of production that Wisconsin requires for affirmative defenses like adequate provocation: the "some evidence" threshold. If he met that burden at trial, the prosecutor would bear the burden of persuasion and would have to disprove the defense beyond a reasonable doubt. To show before trial that he had "some evidence" of adequate provocation, Schmidt needed to reveal only his best evidence. These are not procedural concepts that a layperson—especially one whose own fate is at stake—is likely to understand, let alone execute. The transcript in this case shows as much. Schmidt's lack of understanding about the burden of production caused him to disclose too much at this stage. In effect, Schmidt did the prosecutor's job for her and converted the *ex parte, in camera* hearing into a mini-trial on the merits of his defense.

In sum, in this hearing conducted without his counsel's participation, Schmidt not only confronted a complex substantive and procedural question; he was also forced to defend his position on the meaning of the procedural rule after the prosecutor challenged him. This was a critical stage—in this case, actually *the most* critical stage—of this prosecution. The accused's right to counsel in this inquisitorial hearing did not depend on whether the prosecutor was in the room, or on whether the judge's tone of voice and phrasing of questions were gentle or hostile. What mattered, under clearly established Supreme Court precedent, is that Schmidt was confronting the complex machinery of the criminal justice process on the most critical, disputed, and substantive issue in the case.

### 2.  *Potential for Prejudice*

For a pretrial confrontation to be a critical stage, it must also have the potential to prejudice the defendant and therefore undermine the integrity of the trial. *Wade*, 388 U.S. at 227. The *ex parte*, *in camera* hearing had the potential to prejudice Schmidt substantially. The state court's conclusion to the contrary was unreasonable. "Fatal to Schmidt's argument," the Wisconsin court reasoned, the hearing was "supplemental" and "Schmidt had already submitted written offers of proof" in support of his defense. The logic of that rationalization for denying Schmidt assistance of counsel flies in the face of clearly established Supreme Court precedent.

The Sixth Amendment analysis focuses on whether there is a potential for prejudice given what or whom the uncounseled defendant must confront and what counsel could do later to fix the defendant's mistakes. E.g., *Ash*, 413 U.S. at 313,

317; *Coleman*, 399 U.S. at 7 (plurality); *id.* at 11 (Black, J., concurring); *Wade*, 388 U.S. at 227. In this case, Schmidt was asked to meet the burden of production to preserve his most promising—indeed, his only—defense in mitigation at trial. In this case, no stage was more critical. What happened in chambers settled Schmidt's fate. It reduced "the trial itself to a mere formality." See *Wade*, 388 U.S. at 224.

The criminal process is full of pretrial steps that involve both written and oral submissions to the court: to name a few, motions to suppress evidence; motions challenging venue, jurisdiction, or competency to stand trial; and motions asserting selective or vindictive prosecution, or denial of speedy trial rights, or discovery disputes. Counsel's help with the written half of the process does not erase the potential for prejudice in the oral half, let alone justify denying assistance of counsel. To our knowledge, the Supreme Court has never held that having assistance of counsel in part of a critical stage of the prosecution justifies denial of counsel in the rest of it. In this case the judge questioned Schmidt after reviewing the written offers of proof. If the judge had thought the written offers of proof had met the some-evidence threshold, the *ex parte*, *in camera* questioning would have been unnecessary. What Schmidt would say in chambers was critical.

Even if Schmidt had met the some-evidence threshold in his written offers of proof alone, his unfocused "rambling narrative" in chambers could have diluted that evidence with details harmful to his defense. At that point in the pretrial process, Schmidt did not need to prove adequate provocation. He needed to provide "some evidence" of it. *Schmidt*, 824 N.W.2d at 843, citing *Head*, 648 N.W.2d at 439.

The risk was not only that the judge might lose sight of the elements of adequate provocation or might fail to separate the wheat from the extensive chaff in Schmidt's rambling answers, though those are certainly good reasons for needing counsel in the hearing. There was also a risk that Schmidt would convert the hearing into a mini-trial on the merits of his defense rather than a debate about the burden of production. If Schmidt could have just met the burden of production—and only that burden—he would have had the right to present his evidence and argue his defense to the jury. And the trial judge's oral ruling suggests that this risk might have played out here: "The Court finds that the circumstances that led to the death of Kelly Wing did not involve a provocation and it was not an adequate provocation and denies the motion." That conclusion sounds more like a decision on the merits than a decision on the burden of production.

Finally, Schmidt's counsel could not fix later the harm done by Schmidt's answers. The trial court silenced counsel in the *ex parte* hearing and ruled on the defense shortly after questioning Schmidt. Because counsel could not later undo the harm to Schmidt, the risk of prejudice at the evidentiary hearing infected his trial.

### 3. *Role of Counsel*

The last factor in the critical-stage analysis is whether counsel could have helped Schmidt avoid prejudice at the hearing. There can be no doubt that Schmidt would have benefited from his attorney's help at the hearing. It is a basic tenet of constitutional law that an accused has a right to counsel when he is in custody or after formal proceedings have begun against him because of the risk that he will inadvertently harm his defense. See *Miranda v. Arizona*, 384 U.S. 436, 466

(1966) (Sixth Amendment guarantees right to counsel at police interrogation to protect defendant against self-incrimination); *Massiah*, 377 U.S. at 206 (same in interrogation by government informant). The dangers to Schmidt and the opportunity for his counsel to help him are both evident here.

In *Ferguson v. Georgia*, 365 U.S. 570, 594–96 (1961), the Supreme Court explained the need for counsel in a context very close to this case. At that time, Georgia prohibited the accused from testifying in his own defense. State law allowed the accused to make an unsworn statement to the jury, but he ordinarily had to do so without questioning by his counsel to guide him. The Court held that the defendant had a right to have his counsel question him to elicit his statement. In explaining this conclusion, the Court quoted Chief Justice Cooley, the nineteenth-century jurist from Michigan, in a lengthy passage that fits Schmidt's case well:

> But to hold that the moment the defendant is placed upon the stand he shall be debarred of all assistance from his counsel, and left to go through his statement as his fears or his embarrassment may enable him, in the face of the consequences which may follow from imperfect or unsatisfactory explanation, would in our opinion be to make, what the statute designed as an important privilege to the accused, a trap into which none but the most cool and self-possessed could place himself with much prospect of coming out unharmed. An innocent man, charged with a heinous offence, and against whom evidence of guilt has been given, is much more likely to be overwhelmed by his situation,

*and embarrassed, when called upon for explanation, than the offender, who is hardened in guilt; and if he is unlearned, unaccustomed to speak in public assemblies, or to put together his thoughts in consecutive order any where, it will not be surprising if his explanation is incoherent, or if it overlooks important circumstances.*

365 U.S. at 595–96 (emphasis added), quoting *Annis v. People*, 13 Mich. 511, 519–20 (1865) (reversing conviction where trial judge had not allowed defense counsel to remind defendant he had omitted a material fact from his statement).

Schmidt was not innocent, but the subject of the *ex parte*, *in camera* hearing was his only theory of mitigation. And what *Ferguson* described with the quotation from *Annis* is just what happened here. Without the guidance of counsel's questioning, Schmidt provided an incoherent account of the circumstances that might have supported his defense in mitigation. (Recall that the Wisconsin Court of Appeals said it was "a close question" whether Schmidt had produced "some evidence" sufficient to present a triable defense of adequate provocation.) Counsel could have helped him organize the facts, present a coherent and legally relevant response, and meet the burden of production. Without counsel acting in that role, "a serious risk of injustice infects the trial itself." *Cronic*, 466 U.S. at 656, quoting *Cuyler v. Sullivan*, 446 U.S. 335, 343 (1980).

B. *Assistance of Counsel at the Hearing*

Because the hearing was a critical stage in Schmidt's case, the next question is whether Schmidt received the assistance

of counsel during it. The Wisconsin Court of Appeals reasoned that Schmidt's counsel was present for the *ex parte* hearing and could have advised Schmidt and answered any questions he had. Under AEDPA, we presume that this was a finding on the merits. *Johnson v. Williams*, 568 U.S. 289, 293 (2013). Even assuming AEDPA controls, it is unreasonable to conclude that counsel's silent (and silenced) presence satisfied the Sixth Amendment. See 28 U.S.C. § 2254(d)(1).

The Sixth Amendment guarantees the *effective* assistance of counsel, of course. *Strickland v. Washington*, 466 U.S. 668, 686 (1984); *Cronic*, 466 U.S. at 654; *McMann v. Richardson*, 397 U.S. 759, 771 (1970). The Sixth Amendment is not satisfied when "no actual Assistance for the accused's defence is provided" and, as a result, the prosecution's case is not tested against "the crucible of meaningful adversarial testing." *Cronic*, 466 U.S. at 654, 656 (internal quotations omitted). Attorneys can be constitutionally ineffective either because of their own errors or because the government interferes with their performance. *Strickland*, 466 U.S. at 687, 692; *Cronic*, 466 U.S. 658–60 (categorizing circumstances when government interference with attorney performance violates Sixth Amendment). The Supreme Court has held that the government violates the Sixth Amendment when it interferes to such an extent that "although counsel is available to assist the accused," the "likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate without inquiry into the actual conduct." *Cronic*, 466 U.S. at 659–60.

A long line of Supreme Court cases has applied the rule that mere appointment or presence of counsel is insufficient

if state action converts counsel's presence into a sham. In *Powell v. Alabama*, the Court held that "defendants were not accorded the right of counsel in any substantial sense" when the court appointed defense lawyers for the Scottsboro Boys but did not give the lawyers adequate time to prepare for trial. 287 U.S. at 57–58; see also *Avery v. Alabama*, 308 U.S. 444, 446 (1940) ("[T]he denial of opportunity for appointed counsel to … prepare his defense, could convert the appointment of counsel into a sham and nothing more than a formal compliance with the Constitution's requirement."). In *Ferguson*, as noted, the Court found unconstitutional a rule that prohibited defense counsel—though present at trial—from directly examining a defendant who chose to speak in his own defense. 365 U.S. at 596. In *Geders*, the Court found that "an order preventing petitioner from consulting his counsel 'about anything'" overnight during trial "impinged upon his right to the assistance of counsel." 425 U.S. at 91. And in *Holloway v. Arkansas*, the Court found that the "mere physical presence of an attorney does not fulfill the Sixth Amendment guarantee" when the state refused to appoint counsel free of conflicts of interest and "the advocate's conflicting obligations … effectively sealed his lips on crucial matters." 435 U.S. 475, 490 (1978). Thus, the Court has "uniformly found constitutional error" when counsel was "either totally absent, *or prevented from assisting* the accused during a critical stage." *Cronic*, 466 U.S. at 659 n.25 (emphasis added).

Even comparatively modest government interference with the attorney's ability to exercise judgment can render counsel ineffective and violate the Sixth Amendment. See *Herring*, 422 U.S. at 863, 865 (state violated Sixth Amendment by barring defense attorney from giving closing summation in bench

trial); *Brooks v. Tennessee*, 406 U.S. 605, 612–13 (1972) (state violated Sixth Amendment by requiring that defendant who chose to testify be the first witness). The Court summarized its precedent in *Strickland*:

> That a person who happens to be a lawyer is present at trial alongside the accused, however, is not enough to satisfy the constitutional command. The Sixth Amendment recognizes the right to the assistance of counsel because it envisions counsel's playing a role that is critical to the ability of the adversarial system to produce just results. An accused is entitled to be assisted by an attorney, whether retained or appointed, who plays the role necessary to ensure that the trial is fair. For that reason, the Court has recognized that the right to counsel is the right to effective assistance of counsel.

466 U.S. at 685–86 (collecting cases; internal quotations omitted).

In this case, Schmidt's counsel was, in the trial judge's own words, "just … present" and "not saying anything" during the *ex parte* hearing. The state thus prevented Schmidt's counsel from performing the "role that is critical to the ability of the adversarial system to produce just results." *Strickland*, 466 U.S. at 685. Schmidt's counsel was not allowed to speak while the court questioned his client on the most important issue in his defense. It was objectively unreasonable for the state court to conclude that Schmidt's counsel could have provided effective assistance and meaningfully tested the arguments against the provocation defense by "not saying anything." See *Cronic*, 466 U.S. at 656, citing *Anders v. California*, 386 U.S. 738, 743

(1967) (summarizing Supreme Court precedent requiring counsel acting as an advocate).

In this appeal, the State echoes the state court's suggestion that Schmidt's counsel "could have objected" during the hearing and was "functionally present" to help Schmidt. We find no factual support for these statements. The trial judge told Schmidt—and assured the prosecutor—that Schmidt's counsel would not say anything during the hearing. Once in chambers, the judge reiterated that Schmidt's counsel was not to participate. And throughout the *ex parte* hearing, Schmidt spoke uninterrupted by his counsel for long enough to fill thirty-five transcript pages. The judge addressed Schmidt directly, not his counsel. Given the judge's ground rules for the hearing, there is no basis for the conclusion that counsel could have objected or advised Schmidt. Doing so would have amounted to contempt of court.

The State also argues that Schmidt could have cured any prejudice by supplementing his offers of proof after the *ex parte* hearing. The State points to an earlier pretrial hearing when the court announced that it would hold the hearing on the provocation defense and might allow Schmidt to supplement the record "if the Court is not satisfied" at "the end of that" hearing. There are three major flaws in this argument. First, the accused is entitled to the assistance of counsel during the entirety of a critical stage, not just part of it. Second, and more specifically, Schmidt needed counsel's help in confronting the burden of production on a complex factual and legal defense. The prejudice he suffered came from disclosing irrelevant details and diluting the evidence that could support his defense. Any hypothetical opportunity to supplement the record later would not have reversed the damage to Schmidt's

case or satisfied Schmidt's right to counsel during the critical hearing itself.

Third, again, the factual record does not support the State's argument. The trial court ruled on the provocation defense immediately after the *ex parte* proceeding. When Schmidt's counsel mentioned supplementing the record a month later, the judge replied that he had already "ruled on" the defense.

The State also points out that Schmidt's counsel did not object to the judge's ground rules that required counsel to remain silent during the *ex parte* hearing. (Schmidt's counsel did object to holding the hearing at all, and to the judge's plan to question Schmidt himself, but on Fifth Amendment grounds.) The absence of a Sixth Amendment objection does not matter here. The accused himself may waive the right to counsel, whether for the entire case or for a particular stage of the proceeding, but any waiver must be knowing and intelligent. E.g., *Brewer v. Williams*, 430 U.S. 387, 404 (1977) (state must prove "intentional relinquishment or abandonment of a known right or privilege" to show waiver of right to counsel at critical stage). There is also a strong presumption against waiver of constitutional rights that preserve a fair trial. *Id.*; *Schneckloth v. Bustamonte*, 412 U.S. 218, 237–38 (1973). There is no indication in this record that Schmidt knew he had a right to effective assistance of counsel in the highly unusual *ex parte*, *in camera* hearing, let alone that he knew the judge's ground rules would deny him that right or that he agreed to waive the right.

Finally, the State points to the brief recess late in the hearing when the judge made a telephone call. Counsel asked if he might speak to his client during the short recess. The judge

said only that counsel could review the written offer of proof summarizing Schmidt's intended defense. This limited opportunity for a brief talk with counsel was not enough to satisfy the Sixth Amendment "in any substantial sense," and to conclude otherwise "would simply be to ignore actualities." *Powell*, 287 U.S. at 58. As the Supreme Court has observed, the "tensions of a trial for an accused with life or liberty at stake might alone render him utterly unfit to give his explanation properly" when speaking "without the guiding hand of counsel." *Ferguson*, 365 U.S. at 594 (internal quotations and citations omitted). Schmidt was never guided while explaining his offense and the provocation he claimed. The problems the Supreme Court predicted in *Ferguson* occurred here. Schmidt's answers to the judge's questions were so unfocused, with so much irrelevant and distracting details and sidetracks, that the judge asked him the same question six times: what was your mental state when you shot your wife? The Sixth Amendment guaranteed him more than a silenced attorney listening to his answers.

When the State denies a defendant counsel at a critical stage, prejudice is presumed. E.g., *Bell v. Cone*, 535 U.S. 685, 695–96 (2002); *Cronic*, 466 U.S. at 658–59. The district court's judgment is REVERSED and the case is REMANDED with instructions to grant the writ of habeas corpus ordering that Schmidt be released or retried promptly, or perhaps, as the State suggested in the district court, that the state court modify Schmidt's judgment of conviction to second-degree intentional homicide and re-sentence him accordingly.

BARRETT, *Circuit Judge*, dissenting. I dissent from the majority opinion for three reasons. First, I disagree that clearly established Supreme Court precedent dictates the resolution of Schmidt's Sixth Amendment claim. The majority says that this *ex parte* and *in camera* proceeding was a "critical stage," but the Court's "critical stage" precedent deals exclusively with adversarial confrontations between the defendant and an agent of the State. Second, the majority suggests that even if the presence of an adversary is necessary, the judge played that role. The procedural context and transcript, however, provide ample grounds for a fairminded jurist to conclude otherwise. Finally, I disagree with the majority that the Wisconsin Court of Appeals unreasonably applied federal law in deciding that this proceeding did not risk substantial prejudice to Schmidt. The prejudice alleged is that Schmidt's wandering testimony cluttered the record with irrelevant details that distracted the judge from Schmidt's best evidence. This proceeding, however, supplemented the defense's written offer of proof detailing Schmidt's evidence of adequate provocation. A fairminded jurist could conclude that the written summary of Schmidt's evidence kept the judge from losing the forest for the trees.

## I.

Because the Wisconsin Court of Appeals adjudicated Schmidt's Sixth Amendment claim on the merits, the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA) prevents us from granting his application for a writ of habeas corpus unless the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the

United States." 28 U.S.C. § 2254(d)(1). The majority's description of this case as "unprecedented" and "highly unusual" gives away the fact that the opinion enters territory that the Supreme Court has not broached. Existing Supreme Court precedent addresses a defendant's right to counsel in certain adversarial confrontations with a prosecutor, the police, or an agent of either. No Supreme Court precedent addresses the question presented by this case: whether a defendant has the right to counsel when testifying before a judge in a nonadversarial proceeding. Because there is no clearly established Supreme Court precedent for the Wisconsin Court of Appeals to have unreasonably applied, Schmidt cannot satisfy § 2254(d)(1)'s stringent standard for relief.

## A.

The majority describes Supreme Court precedent as "clearly stand[ing] for the proposition that" counsel is "required at every stage of a criminal proceeding where substantial rights of a criminal accused may be affected." Majority Op. at 17 (citing *Mempa v. Rhay*, 389 U.S. 128, 134 (1967)). That states the rule at too high a level of generality. The Court's "critical stage" precedent deals exclusively with a defendant's right to counsel in adversarial confrontations with law enforcement. And the connection between the right to counsel and an adversarial confrontation is by no means a mere sidelight in the cases; it is central to them.

The Court has rooted the right to counsel in the need to protect the defendant when he faces the prosecuting authority. In *United States v. Ash*, it explained that the right emerged alongside the introduction of a "government official whose specific function it was to prosecute, and who was incomparably more familiar than the accused with the problems of

procedure, the idiosyncrasies of juries, and, last but not least, the personnel of the court." 413 U.S. 300, 308 (1973) (citing F. Heller, The Sixth Amendment 20–21 (1951)). Consistent with this history, the Sixth Amendment was designed "to minimize imbalance in the adversary system that otherwise resulted with the creation of a professional prosecuting official." *Id.* at 309. While the Amendment's protection is not limited to the formal trial, "[t]he Court consistently has applied a historical interpretation of the guarantee, and has expanded the constitutional right to counsel only when new contexts appear presenting the same dangers that gave birth initially to the right itself." *Id.* at 311.

The "new contexts" to which the Court has extended the right invariably involve a confrontation between the defendant and his adversary, be it a prosecutor, the police, or one of their agents. For example, in *Estelle v. Smith*, a psychiatrist functioning as an "agent of the State" performed an examination of the defendant in his jail cell. 451 U.S. 454, 467 (1981).[5]

---

[5] The majority characterizes *Estelle* as a case in which the Court recognized the right to counsel in a non-adversarial proceeding. Majority Op. at 18–19. In *Estelle*, the judge had "informally ordered the State's attorney to arrange a psychiatric examination of [the defendant] … to determine [his] competency to stand trial,"451 U.S. at 456–57, and the majority asserts that the Court held that "the judge's non-adversarial decision to order the psychiatric interview … was a critical stage of the proceedings." Majority Op. at 18. But it was the examination by the psychiatrist, not the decision by the judge, that the Court deemed a "critical stage." 451 U.S. at 470 ("[R]espondent's Sixth Amendment right to counsel clearly had attached when Dr. Grigson examined him at the Dallas County Jail, and their interview proved to be a 'critical stage' of the aggregate proceedings against the respondent." (footnote omitted)). And the Court left no doubt that the psychiatrist functioned as the defendant's adversary. It stressed that the defendant was "faced with a phase of the adversary system" and was "not

In *Coleman v. Alabama*, the defendant attended a preliminary hearing at which there was an opportunity to cross-examine the prosecution's witnesses, preview the prosecutor's case to better prepare for trial, and argue for matters such as "the necessity for an early psychiatric examination or bail." 399 U.S. 1, 9 (1970) (plurality opinion). In *United States v. Wade*, an FBI agent conducted a lineup of Wade and several other prisoners. 388 U.S. 218 (1967). In *Mempa v. Rhay*, the defendant was summoned to a hearing at which the prosecutor sought to have his probation revoked and a sentence imposed. 389 U.S. 128 (1967). In *Massiah v. United States*, federal agents sent an informant wearing a wire to elicit incriminating testimony from the defendant after he had already been indicted. 377 U.S. 201 (1964). In *Escobedo v. Illinois*, the police interrogated the defendant without counsel despite his repeated requests that counsel be present. 378 U.S. 478 (1964). In *White v. Maryland*, the prosecutor presented a prima facie case against the defendant at a preliminary hearing, where the defendant pleaded guilty. 373 U.S. 59 (1963) (per curiam).[6] In *Hamilton v.*

in the presence of [a] perso[n] acting solely in his interest." *Id.* at 467 (citations omitted). The psychiatrist assessed the defendant's "future dangerousness," gathering evidence that the prosecution used in seeking the death penalty, *id.* at 467, 471, and he then testified against the defendant at trial, "recounting unwarned statements made in a postarrest custodial setting." *Id*. at 467. Given the stakes of submitting to such an interview, the Court held that the defendant had the right to counsel's help in deciding whether to do it. *Id.* at 470.

[6] The brief per curiam opinion is short on details, but the petitioner's brief explains that at a preliminary hearing in Maryland, "the defendant may be called upon by the magistrate to plead guilty or not guilty, and a plea of guilty is admissible evidence at the subsequent trial of his case. Here, also, the defendant is afforded the first opportunity to be informed of the charges against him, cross-examine State's witnesses, and begin to

*Alabama*, the defendant faced the prosecutor at arraignment, which was his only opportunity to plead insanity, make pleas in abatement, and move to quash the indictment based on racial discrimination in the composition of the grand jury. 368 U.S. 52 (1961). Although these confrontations occurred outside the context of the formal trial, the Sixth Amendment applied because they "offered opportunities for prosecuting authorities to take advantage of the accused," or the risk that the accused "might be misled by his lack of familiarity with the law." *Ash*, 413 U.S. at 312, 317.[7]

---

effectively prepare his defense … [The magistrate's] sole function at this hearing is to determine from the evidence presented by the State's attorney whether to hold the accused for the action of the Grand Jury … or discharge him." Petitioner's Brief at 4, 6.

[7] The majority relies on *Geders v. United States*, 425 U.S. 80 (1976), as support for the proposition that a proceeding need not be adversarial for the right to counsel to apply. *See* Majority Op. at 19. *Geders*—which is not a "critical stage" case—is inapposite. In *Geders*, the Court held that the trial court violated the defendant's Sixth Amendment right when it instructed all witnesses, including the defendant, not to discuss the case with anyone during an overnight recess in the trial. The case did not present the question whether a particular event (there, the overnight recess) is a "critical stage" at which the state must ensure that the defendant is either accompanied by counsel or waives his right to be accompanied by counsel. It presented the different question whether a trial court can prevent the defendant from consulting counsel on his own initiative outside of the trial. *Id.* at 88. *Geders* says nothing about the characteristics of a "critical stage," much less suggests that such a stage need not be adversarial. Nor does *Geders* stand for the proposition that the start of the adversarial process— or even the start of trial—marks the beginning of a continuous "critical stage." On the contrary, the Court has indicated that a trial may encompass stages that are not critical. *See*, *e.g.*, *Woods v. Donald*, – U.S. –, 135 S.Ct. 1372, 1377–78 (2015) (per curiam) (reversing the Sixth Circuit's grant of

*Ash* includes a line that is susceptible to misinterpretation. There, the Court said that a stage is critical when "the accused was confronted, just as at trial, by the procedural system, or by his expert adversary, or by both." *Id*. at 310. This language could be understood as setting up alternative settings—one non-adversarial and the other adversarial—in which the right to counsel applies. In context, however, it is evident that the Court was explaining why it has extended the right of counsel not only to situations in which the defendant or his witness is questioned by the police or prosecutor (as in post-indictment interrogation of the accused or examination at trial), but also to situations in which the prosecutor puts the accused to a procedural choice (like entering a plea or raising a defense). In other words, *Ash* describes two kinds of risks that an accused might face in an adversarial setting. It does not describe the right to counsel as extending outside of an adversarial proceeding, and the Court has not understood it that way.

To the contrary, the Court has never extended the right outside of the adversarial context. And when it has refused to extend the right, it has done so on the ground that the proceeding was not adversarial. *Ash* refused to extend the right of counsel to a post-indictment photographic display precisely because the display involved no confrontation between the accused and the prosecuting authority. 413 U.S. at 315, 321. Similarly, in *Gerstein v. Pugh*, the Court held that a probable cause hearing is not a critical stage "[b]ecause of its limited function and its nonadversary character." 420 U.S. 103, 122

---

habeas relief to a petitioner whose counsel was absent during trial testimony about the petitioner's co-defendants because the Court had never held that the presentation of testimony tangentially related to the defendant was a "critical stage").

(1975). We too have recognized the presence of an adversary as a necessary factor for Sixth Amendment protection. In *United States v. Jackson*, 886 F.2d 838, 844 (7th Cir. 1989), for example, we held that a defendant's uncounseled interview with a probation officer in the course of the officer's preparation of the presentence report was not a critical stage precisely because the "probation officer does not have an adversarial role in the sentencing proceedings." Rather than serving as an arm of the prosecutor, "the probation officer serves as a neutral information gatherer for the sentencing judge." *Id.*

## B.

The majority acknowledges that the Court has never addressed a claim like Schmidt's. But it points out that a case need not present facts identical to those previously considered by the Court for clearly established precedent to govern it. The Court has said that a state court acts unreasonably for purposes of § 2254(d)(1) if it "refuses to extend [controlling Supreme Court precedent] to a new context where it should apply." *Williams v. Taylor*, 529 U.S. 362, 407 (2000). The majority reasons that the Wisconsin trial court's questioning of Schmidt is such a context—not one that the Court has confronted before, but one to which its "critical stage" precedent clearly extends.

This reasoning only works, however, if the controlling precedent is read at the level of generality the majority proposes—as establishing the right to counsel in any post-indictment proceeding in which legal assistance would help the accused avoid substantial prejudice. If that is the law, then we need to decide whether the state court unreasonably refused to apply it to this new context. But if the precedent is read more narrowly—as establishing the right to counsel when the

accused faces his adversary—then clearly established law does not dictate the outcome. Resolving the Sixth Amendment question therefore requires us to decide the level of generality at which to read the Supreme Court's precedent.

*Carey v. Musladin* answers that question: we track the level of generality at which the Court has spoken. 549 U.S. 70 (2006). In *Carey*, the Court reviewed the Ninth Circuit's determination that buttons with the victim's image worn by courtroom spectators had deprived the habeas petitioner of a fair trial. The Court had previously held that certain state-sponsored practices (like compelling a defendant to wear prison clothing at trial) were "inherently prejudicial," and the Ninth Circuit reasoned that the buttons posed a similar risk. The Court rejected that reasoning. The Ninth Circuit interpreted the Court's precedent as establishing a general rule against courtroom conduct inherently prejudicial to the defendant; it should have interpreted the Court's precedent as establishing a more specific rule against *state-sponsored* courtroom conduct inherently prejudicial to the defendant. *Id.* at 76. The Court emphasized that it "ha[d] never addressed a claim that such private-actor courtroom conduct was so inherently prejudicial that it deprived a defendant of a fair trial." *Id*. By stating the rule more broadly than the Court had, the Ninth Circuit held the state responsible for violating law that was not clearly established.

So here. The Court has never addressed a claim that a defendant has a right to counsel in an *ex parte* and *in camera* proceeding before a judge. Like the Ninth Circuit in *Carey*, the majority errs by stating the established law at a higher level of generality than the Court has. Indeed, the centrality of ad-

versarial confrontation to the Court's "critical stage" jurisprudence makes the extraction of a general principle from a more specific rule even more evident here than it was in *Carey*.

To be clear, *Carey* is not inconsistent with the Court's admonition in *Williams v. Taylor* that a state court acts unreasonably if it "refuses to extend [controlling Supreme Court precedent] to a new context where it should apply." 529 U.S. at 407. A state court cannot treat the Court's clearly established precedent as fact-bound. On the contrary, a state court, like a reviewing federal court, must respect the level of generality at which the Court has spoken. Just as a federal court cannot elevate the level of generality, a state court cannot contract it. Thus, a state court would act unreasonably if it refused to recognize a defendant's right to counsel in a post-indictment, adversarial proceeding on the ground that the proceeding was not exactly the same as those the Court has previously addressed. Clearly established law does not entitle the defendant to counsel in a laundry list of specific proceedings, but in "proceedings between an individual and agents of the State … that amount to 'trial-like confrontations,' at which counsel would help the accused 'in coping with legal problems or … meeting his adversary." *Rothgery v. Gillespie County*, 554 U.S. 191, 212 n.16 (2008) (citations omitted). The state court is obliged to follow that rule, even if the factual circumstance is new. But under AEDPA, we cannot hold the state court accountable for declining to expand the rule itself.

Perhaps the right to counsel should extend to a hearing like the one the judge conducted in Schmidt's case. But AEDPA precludes us from disturbing a state court's judgment on the ground that a state court decided an open question differently than we would—or, for that matter, differently than

we think the Court would. Because the Court has never addressed the question that the Wisconsin Court of Appeals faced, there was no clearly established precedent for it to flout.

## II.

The majority does not rely exclusively on an extension of the Court's "critical stage" cases to nonadversarial proceedings. Its opinion appears to rest on a second rationale: that this proceeding was functionally adversarial. While it stops short of actually calling the judge the defendant's "adversary," it strongly implies that the judge stood in the shoes of the prosecutor. The majority's reasoning, then, seems to be twofold. Clearly established Supreme Court precedent is not limited to adversarial proceedings, but in any event, this proceeding was functionally adversarial and risked substantial prejudice to Schmidt. In concluding otherwise, the Wisconsin Court of Appeals unreasonably applied clearly established federal law.

The majority gives too little deference to the Wisconsin Court of Appeals. A state-court decision is "unreasonable" under § 2254(d) if it is "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Woods v. Etherton*, – U.S. –, 136 S. Ct. 1149, 1151 (2016) (per curiam) (citation and quotation marks omitted); *see also Harrington v. Richter*, 562 U.S. 86, 102 (2011) (Section 2254(d) "preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents."). That is a high bar, and Schmidt does not clear it.

A.

The majority holds that the Wisconsin Court of Appeals unreasonably applied the Court's "critical stage" jurisprudence when it concluded that the *ex parte* and *in camera* proceeding was nonadversarial. Given the prosecutor's absence, it was certainly not "adversarial" in the ordinary sense of the word—or in the sense that the Court has employed it in the cases. In an effort to get around that, the majority characterizes the proceeding as "inquisitorial." If used in its benign sense—as referring to the system of proof-taking in civil law systems—the word "inquisitorial" by definition means nonadversarial. *See* Majority Op. at 15 n.3. At some points in its opinion, the majority concedes that the proceeding was nonadversarial and faults it on that ground. *See*, *e.g.*, Majority Op. at 14. (That concession, of course, forecloses the argument that the Wisconsin Court of Appeals unreasonably characterized the *ex parte* and *in camera* hearing as a nonadversarial one.) Elsewhere, however, the majority asserts that the proceeding was adversarial. Majority Op. at 22–23. This suggests that the majority is using the description "inquisitorial" as it is often deployed in American criminal cases—to describe a proceeding in which the accused faces an aggressive questioner gathering evidence against him. *See*, *e.g.*, *Miller v. Fenton*, 474 U.S. 104, 110 (1985); *Miranda v. Arizona*, 384 U.S. 436, 442–43 (1966). And while the majority does not attribute ill will to the judge, it does cast him as Schmidt's adversary. Majority Op. at 23 (asserting that the hearing was a "trial-like confrontation" in which "the judge took the accused and his (silenced) lawyer

into chambers to question him about the facts supporting the defense").

The transcript, however, contains no suggestion that the judge ever functioned as a surrogate prosecutor. His aim was not to secure Schmidt's conviction—or, as specifically relevant here, to establish that Schmidt was not entitled to raise the "adequate provocation" defense. On the contrary, as the Wisconsin Court of Appeals observed, the judge conducted the proceeding this way for Schmidt's benefit.

The hearing grew out of a dispute between the parties about when the trial court would decide whether Schmidt had sufficient evidence to put the "adequate provocation" defense in issue. Schmidt argued that Wisconsin law required the court to wait to resolve that question until it instructed the jury; doing it before trial, he insisted, would give the prosecution a preview of his case. The State wanted the court to rule on the admissibility of Schmidt's evidence before trial; otherwise, it argued, the jury would hear a litany of prejudicial evidence about the victim that might not be probative of an issue actually in the case. The court agreed with the State. It decided—in a ruling that the Wisconsin Court of Appeals ultimately affirmed—that Wisconsin law gave the trial court the discretion to determine before trial whether the defendant could carry his burden of production on the "adequate provocation" defense.

While the judge decided to make the evidentiary determination before trial, he was sympathetic to Schmidt's concern about showing the prosecutor his hand. He proposed the *ex parte* and *in camera* hearing as a way of addressing that concern. Defense counsel responded as follows to the court's proposal:

> A suggestion that I was going to bring up today is
> that the Court, if you are going to ask for evidence
> from the defendant or evidence that goes to his sub-
> jective belief for adequate provocation, is that, in
> fact, we would do an ex parte in-camera inspection
> of the Court and the defendant and seal those rec-
> ords because I don't think it would be—it should be
> allowed to the State and should have that infor-
> mation prior to trial.

Transcript of Motion Hearing 2.10.2010 at 5. The court wanted defense counsel to accompany Schmidt, but because the prosecution was barred from the hearing, the court instructed defense counsel to function as an observer only. The prosecutor agreed to the proceeding on that condition. Had Schmidt's counsel actively participated, the judge would have included the prosecutor, and Schmidt wanted the prosecutor out of the room.

The majority puts little weight on the prosecutor's absence, because it suggests that the judge filled the prosecutor's shoes.[8] The judge, however, spoke very little during the hearing. Instead, he primarily listened as Schmidt testified about

---

[8] The majority also suggests that the *ex parte* and *in camera* proceeding followed on the heels of the prosecutor's oral argument about why Schmidt's evidence fell short of what was necessary to carry his burden of production. Majority Op. at 21. But the judge did not hear arguments about the substance of the adequate provocation issue from either side before he examined Schmidt. He "entertain[ed] comments from counsel" on the procedural questions of whether he could resolve the burden-of-production question before trial and whether he could do an *in camera* inspection of Schmidt. Transcript of Motion Hearing 2.10.2010 at 2–7. The rest of the hearing dealt with various trial-management matters. At no point did

his state of mind before he shot his wife.[9] And far from positioning himself as Schmidt's adversary, the judge tried to help him by calling a recess so that Schmidt could review the written offer of proof with his counsel.[10] The offer of proof was a roadmap for Schmidt's testimony. It contained a timeline of the allegedly provocative events, and the judge wanted Schmidt to refresh his memory so that he didn't overlook any. Before the recess, he told Schmidt "that you might not state all of the things that are in the offer of proof, possibly because you … haven't had an opportunity to review this." Transcript of Proceedings at 25. When the hearing resumed, the judge asked Schmidt how the incidents described in the document might have affected his state of mind.

In retrospect, it may have been better for the judge to decline Schmidt's request for an *ex parte* and *in camera* hearing. There would be no Sixth Amendment question before us if the judge had proceeded in the normal course, with both lawyers participating. That said, the judge structured the hearing as

---

the prosecutor make an argument about why Schmidt's evidence of adequate provocation was insufficient.

[9] Schmidt, who testified voluntarily, does not argue that the court violated his Fifth Amendment right against self-incrimination. As the trial court noted "[the pretrial hearing] accelerates what the defendant might already say in a trial, but it is the defendant that chooses to present this defense." Transcript of Motion Hearing 2.10.2010 at 4.

[10] During this recess, the judge permitted defense counsel to confer with Schmidt while the judge stepped out to make a phone call. Defense counsel asked: "Am I allowed to talk to my client now or not?" The judge responded: "It's off the record. Yeah, you can talk. But he should just be reviewing [the offer of proof]." Transcript of Proceedings at 26.

he did in an effort to accommodate Schmidt, and the transcript reflects that the judge remained neutral throughout it. It was therefore reasonable for the Wisconsin Court of Appeals to conclude that this was not a trial-like confrontation in which Schmidt was entitled to counsel to "compensate[] for advantages of the prosecuting authorities." *Ash*, 413 U.S. at 314.

B.

It is not enough for Schmidt to demonstrate that the Wisconsin Court of Appeals unreasonably concluded that this proceeding was nonadversarial. To secure relief, Schmidt must also show that no fairminded judge could conclude that this hearing lacked the potential to substantially prejudice him. That is yet another ground on which Schmidt's argument fails.

According to the majority, "The prejudice [Schmidt] suffered came from disclosing irrelevant details and diluting the evidence that could support his defense." Majority Op. at 32. In other words, Schmidt was harmed because his rambling narrative failed to focus the judge on the evidence most helpful to his "adequate provocation" defense. The idea that the judge—who knew the legal elements of the adequate provocation defense—was incapable of separating the wheat from the chaff sells the judge short.[11] But in any event, the judge

---

[11] The majority also sells the trial judge short with its argument that by saying too much, Schmidt risked confusing the judge about whether he was supposed to resolve the merits or decide whether Schmidt had carried his burden of production on the defense. Majority Op. at 25–26. This argument not only underrates the judge (and the court of appeals that affirmed his judgment), but it also rests on an assumption that is odd given

was not left to cull the evidence without input from defense counsel. As the Wisconsin Court of Appeals said, the examination of Schmidt was supplementary. The judge went into it already having reviewed a legal analysis of the adequate provocation defense; a detailed timeline of the relevant events; the summarized testimony of 29 witnesses who observed his wife's allegedly provocative behavior; a hotel reservation that Schmidt discovered shortly before the shooting and took as evidence of his wife's infidelity; and a copy of a statement that Schmidt gave police at the scene that detailed some of what was in his mind when he shot his wife. So even if Schmidt's testimony cluttered the record with irrelevant details, the written evidence focused the judge on the key facts.

The Wisconsin Court of Appeals acknowledged that it might have been more efficient to have counsel guide the presentation of Schmidt's testimony. But the fact that the participation of counsel would have been helpful to Schmidt does not necessarily mean that the lack of counsel risked substantial prejudice to him. A fairminded jurist could find that this proceeding, which was reinforced by written evidence, did not risk substantial unfair prejudice to Schmidt.

## III.

Because the majority holds that Schmidt is entitled to relief on his Sixth Amendment claim, it does not reach Schmidt's

---

the facts of this case: that Schmidt should have been sparing in his testimony to avoid "convert[ing] the hearing into a mini-trial on the merits of his defense rather than a debate about the burden of production." *Id* at 26. As it was, both the Wisconsin trial and appellate courts found that Schmidt had not introduced enough evidence to get the defense before the jury. Given that his evidence was thin enough to permit that finding, he would have been ill advised to hold back any evidence from the judge.

claim that the *ex parte* and *in camera* hearing arbitrarily violated his due process right to present a defense. For the sake of completeness, I briefly note that I would deny relief on this claim as well.

In both the Wisconsin Court of Appeals and the federal district court, Schmidt asserted a claim under *Chambers v. Mississippi*, which holds that state evidentiary rules must yield to the defendant's due-process right to present a defense. 410 U.S. 284 (1973). According to Schmidt, Wisconsin violated the Due Process Clause by requiring him to satisfy a burden of production (that he produce "some evidence" of adequate provocation) before he could introduce evidence of that defense at trial. Both the Wisconsin Court of Appeals and the federal district court correctly rejected that claim, because, among other things, none of the cases in which the *Chambers* principle has prevailed (and it has prevailed only rarely) "involved restrictions imposed on a defendant's ability to present an affirmative defense." *Gilmore v. Taylor*, 508 U.S. 333, 343 (1993); *see also Kubsch v. Neal*, 838 F.3d 845, 858 (7th Cir. 2016) (en banc) (discussing *Chambers* and its progeny). Adequate provocation in Wisconsin is an affirmative defense. Wis. Stat. § 939.44(2).

Presumably recognizing the weakness of his *Chambers* claim, Schmidt has repackaged his due process argument into a new claim. Before us, he argues not that Wisconsin's evidentiary rules must yield to his due process right to put on a defense, but that the trial court's use of the *ex parte* and *in camera* process violated the Due Process Clause. Because Schmidt did not raise this claim in either the Wisconsin Court of Appeals

or the federal district court, I would deny it as both procedurally defaulted and forfeited.

*  *  *

The standard for relief under AEDPA is intentionally difficult because federal habeas review of state convictions "frustrates both the States' sovereign power to punish offenders and their good-faith attempts to honor constitutional rights." *Calderon v. Thompson*, 523 U.S. 538, 555–56 (1998) (citation and quotation marks omitted). To reinforce that point, the Court has not hesitated to reverse the courts of appeals when they fail to give state courts the deference that AEDPA requires. *See, e.g., Woods*, 136 S. Ct. 1149; *Woods v. Donald*, – U.S. –, 135 S. Ct. 1372 (2015) (per curiam); *White v. Wheeler*, – U.S. –, 136 S. Ct. 456 (2015) (per curiam); *Marshall v. Rodgers*, 569 U.S. 58 (2013) (per curiam); *Nevada v. Jackson*, 569 U.S. 505 (2013) (per curiam); *Parker v. Matthews*, 567 U.S. 37 (2012) (per curiam); *Renico v. Lett*, 559 U.S. 766 (2010). The majority fails to give the Wisconsin Court of Appeals the required deference, and I therefore dissent.